Bradbury, J„
This action was brought in the court of common pleas of Lucas county by a creditor of the Union Manufacturing Company, an insolvent corporation, for the purpose of reaching certain alleged unpaid subscriptions to its capital stock, and to enforce against its stockholders their statutory liability.
*196 The cause was taken to the circuit court on appeal and there tried on its merits. That court stated its finding of facts separately from its conclusions of law. A number of questions arising out of this finding- were argued by counsel at considerable length and with much force and ability. Upon two of those questions this court does not concur in what seem to have been the views of the circuit court. We are by no means certain, however, at least as to one of these questions, that the difference of opinion between the circuit court and this court does not arise out of a different construction, made by the courts respectively, of the finding- of facts rather than out of different views of the law applicable to such facts. 'Be this as it may we will state the conclusions to which we have arrived respecting these two questions; concurring, as we do, with the circuit court upon all the other questions made, we do not regard them of sufficient importance to discuss in this opinion.
The two questions considered, are:
1. The relative rights and liabilities of certain stockholders to whom stock was issued at a discount, and those who subscribed and paid par, for their stock.
2. The liability of William Peter to be assessed under the statute on account of certain shares of stock that he transferred to an insolvent transferree, his purpose in the transaction being to escape liability thereon.
The unpaid subscription sought to be reached, consist of the difference between the par value of certain stock of the corporation issued at a discount, and the price that was in fact paid. This *197 difference made a large sum. The number of shares of stock disposed of at a discount was greater than five thousand, of a par value exceeding §500,000. A small number were issued at fifty cents on the dollar, a few at twenty-five cents on the dollar, but from the other shares, substantially all of them, only twenty cents of the dollar of their par value was realized.
The transactions by which this stock was issued took the form of sales, instead of subscriptions,, the usual method by which corporations issue their stock. The discount suffered by the corporation on account of these sales of stock below par — that is, the difference between its par value and the sum realized by the corporation — was approximately $400,000. If the purchasers of this stock should be held to owe the corporation this difference, the fund realized from this source should be exhausted before resorting to the statutory liability of stockholders; because being assets of the corporation it is primarily liable for the corporate debts. Wright et al. v. McCormack et al., 17 Ohio St., 86. Wehrman & Co. v. Reakert et al. 1 C. S. C. R. 230.
The circuit court did not hold the purchasers of stock at a discount absolutely, liable for the entire difference between the discount price and its par value, but did hold them “liable on said stock as and for unpaid stock subscriptions to its par value, less what has been paid the company for it, so far and so far only as may be necessary to pay the claims of those creditors of the company who be come such after the issue and delivery of such stock and without notice that said company had issued said stock at less than its par value.” * * *
*198 It may be that, if necessary to protect creditors who became such after these transactions occurred, the difference between the discount price and the par value of the stock so sold at a discount, should be held assets of the corporation, collected and applied to the payment of their claims. While the record is not as clear and specific respecting this necessity as.it might have been made, yet if we correctly interpret it such necessity does not appear. On the contrary there were before the court solvent stockholders of enough stock liable to assessment under the statute, to pay all the debts of the corporation; so that the result of collecting any of the alleged balances due on the stock sold at a discount would simply be to reduce the assessment to which stockholders would otherwise be liable under the statute. To creditors it is immaterial whether they are paid out of a fund produced by collecting the balance due on unpaid subscriptions, or from a fund raised by an assessment made upon stock holders under the statute. This matter, however, materially concerned the stockholders inter se. The assessment against them under the statute would be reduced in proportion to the amount collected upon these irregular sales of stock. The controversy therefore respecting the liability of those who had bought the discounted stock, yras between those stockholders who had not and those who had bought stock at a discount.
The finding of the circuit court respecting the circumstances under which the capital stock of the concern was successively increased, and the stock issued at a discount, was both comprehensive and minute. It shows that the concern was incorpo rated in the year 1872 with a capital of $50,000 *199 divided into shares oí $100 each; that the whole of it having been subscribed and fully paid up- prior to April 1873, the capital stock was then increased to $100,000: This stock also having been fully subscribed and paid up, in September, 1883, the capital was further increased to $300,000: That of the 2,000 shares resulting from this last increase, about one-half (1,001 shares) was subscribed and paid for in full for cash or by way of stock dividends : That the remaining shares (999) were issued to different persons hnd paid for in cash, or taken in payment of debts due them from the corporation, at about twenty cents on the dollar of their par value.
The directors,'and its stockholders, generally, believing that the shares thus sold at a discount should be considered as paid-up stock, in good faith about the month of August, 1886, caused the capital stock of the concern to be increased to $1,000,000: Of this increase, amounting to $700,-000, there were subsequently subscribed or sold, 4,245 shares of a par value of $4245.00; but which in fact realized only about twenty cents on the dollar, or one-fifth of its par value. The stock • thus sold by the corporation at that heavy discount, that which resulted from the increase to $300,000; as well as that produced by last increase (to $1,000,000) was substantially all bought by holders of the earlier issued stock who were directors of the concern and closely connected with the management of its affairs. The other stockholders however had an opportunity to obtain this stock from the corporation upon the same terms and in fact were importuned to do so but did not. It thus appears that nearly all of the stock disposed of at the reduced rates, was taken by the *200 directors and officers of the corporation, or those in close touch with them; it was taken however without any intent or design to obtain any advantage over other stockholders of the concern or over the corporation itself, and in the full belief that the title to the shares thus obtained was complete and that the stock was paid for in full. It also appears that this reduced price was more than the full value of the stock at the time the several shares were issued. The concern, during’ the entire period covering’ these issues of stock, was in straightened financial circumstances, and the only practicable method of raising money to meet its obligations was these issues of stock, and that resorts was had to it, solely to raise money for this purpose.
It may be conceded that under section 3262, Revised Statutes, the existing capital stock of a “corporation for profit,” to which class the concern involved in this case belongs, must be fully paid up before the right to increase its capital accrues. This is a condition precedent to such right, and means that the stock shall be actually paid for in full at its par value. To permit the corporation to dispose of its stock at less than its par value, under the form of a sale, instead of by way of subscription, the usual and regular method, would, be to allow it to perpetrate a fraud upon the law. The corporation could defeat the object of the statute, if by selling its own stock at much less than its par value and receiving this reduced price in full payment, it could issue shares to such purchasers, so-called, as fully paid up, and thus entitle it to an increase of its capital stock, although in fact only a small fraction had been paid, while the policy of the state, as declared *201 by the statute on the subject, is to deny to corporations the right and power to increase'their capital stock until that already allowed has been fully paid up. As the $200,000 of stock resulting from the increase from $100,000 to $300,000, made in September, 1881, was not fully paid up, within the meaning of the statute, because a considerable proportion of it was disposed of by the corporation at twenty cents on tbe dollar, and this amount received in full payment, it follows that the increase of $1,000,000, made in 1886, was unauthorized.
If in the history of this concern there appeared the slightest grounds to suspect bad faith in the course pursued by its directors and managers, or others who secured stock at less than par, or if it appeared that by any irregularity for which they were chargeable, or of which they had knowledge, any advantage accrued to them whether intended or not, they would stand before the court in a very different attitude than that in which they now appear. The stamp of absolute good faith, and a singleness of purpose is by the finding of the circuit court fixed upon the several transactions by which this stock was created and issued. That court finds the projectors of this unauthorized increase of capital stock, and those to whom it was issued at less than par were moved by a desire to advance the corporate interests and not their own: That, not only did they not intend to gain personal advantage on account of these transactions but in fact none accrued to them, on the contrary, whatever they paid for the stock issued to them was totally lost, and in addition to the loss of what they paid, they are liable to assessment under the statute as stockholders.
*202 That we are dealing with the rights and liabilities of stockholders alone should, constantly, be borne in mind. Creditors as we have seen, are not concerned in a controversy among the stockholders as to the relative burden to be east upon the latter.
Keeping in mind that the controversy now under consideration is one between stockholders, relieved of all complications growing out of the rights of creditors,, upon what principle should those who, in good faith, and with a purpose to advance the interests of the corporation and not their own, contracted for and received stock at less than its par value, be required to pay the difference between its par value and the .contract price; and that to extent relieve others against assessment on account of their statutory liability? They paid the sum stipulated in the contract, that sum was equal to or greater than the value of the stock they received; they neither intended to nor did acquire any personal advantage from the transaction. The contract was made in good faith and the price paid the full value of the stock at the time. If this was hot binding upon the parties to the contract it is because the corporation had no power to enter into such an ag’reement. This want of power may be conceded, and j^et it would not follow that' the purchasers should pay a greater sum than their contracts called for. Had they acted in bad faith, or even sought in this way to procure stock enough to control and did thereby control the management of the concern, they might be held to the payment of the par value of the stock notwithstanding their contracts stipulated for less. In the absence however of every element of bad faith, if the corporation -is not *203 bound "by the contract neither should the other party be bound and it should be rescinded, in which case the purchaser should be restored to his former condition, and instead of being a holder of corporate stock should be treated as a creditor to the extent of his payment, and where stock had been taken in payment of a corporate debt such debt should be revived.
Those stockholders who paid par for their stock do not desire this result; instead they wish to affirm the sales of stock to the extent of holding the purchasers as stockholders, while repudiating the stipulation respecting the price to be paid. This we think should not be permitted, where the capital stock was increased and the stock sold under such circumstances as the finding of the circuit court discloses.
The decree therefore should be modified in this respect, and-if it is not necessary to protect some creditors of the corporation, who become such after and in ignorance of the manner in which these transactions occured, those who purchased these discounted shares.should hot be held liable for any part of the difference between the par value of the stock and the contract price. And such necessity will not exist until after the statutory liability of all the stockholders shall have been exhausted. As between the stockholders themselves, standing in the relation established by the finding of the circuit court, the plainest principle of equity and fair dealing require that no part of the difference between the contract price, and the par value of the stock sold at a discount should be exacted of its purchasers prior to the complete exhaustion of the statutory liability of every stockholder of the concern.
*204 2. Williám Peter was a large stockholder' of the corporation, the number of shares held by him exceeding twenty-three hundred having a par value greater than $230,000. On February 7th, 1889, he attempted to dispose of one thousand of these shares, hi’s purpose, as he claims, being to escape future liability to corporate creditors on account of th,e shares thus trans ferred.
The finding of the circuit court in respect to this transaction is ás follows :
4. The court further find that on the 7th day of February, 1889, the defendant William Peter, transferred one thousand shares of the capital stock of said company then belonging to him of the par value of $100,000 to Sarah E. Peter, and such transfer was on said day entered upon the books of the said Thé Union Manufacturing Company, and certificates for said one thousand shares issued to the said Sarah E. Peter; that said transfer was made by said William Peter to said Sarah E. Peter for the purpose of avoiding his liability as a holder of said stock for the debts of said company
The court further find from the evidence tnat said William Peter was and continued to be after said transfer, the equitable owner of said stock and as such liable thereon for the indebtedness of the said The Union Manufacturing Company as hereinafter found.
This finding is ambiguous in that it does not show whether the object of Mr. Peter in disposing of these shares was to harass, delay or impede creditors of the corporation then exi sting or to avoid becoming liable, on account of the shares transferred, to its future creditors. He could not by the sale and transfer defeat the ultimate right of existing creditors to proceed against him *205 on account of these shares, if a resort to that liability became necessary for their protection. His ultimate liability to them was fixed by the circumstance that he owned these shares at the time their claims were contracted. Brown v. Hitchcock, 36 Ohio St., 667. Noth withstanding his liability had become fixed in favor of existing creditors, he might resort to a fraudulent scheme to delay, hinder or embarrass them in obtaining relief by making transfers of shares to insolvent transferees. If the transaction thus become tainted with actual fraud it might well be treated as void and the transferee held to be a mere trustee for his benefit.
If the finding on the other hand should- be construed as showing- that his purpose was to avoid liability to future creditors only, then it is uncertain whether the circuit court held that he remained the “equitable owner” of the one thousand-shares of stock, for the reason that they, upon a consideration of all the evidence did not believe that he, in good faith, intended to divest himself of its ownership, or whether, admitting his good faith in the transaction, the court was of opinion that his purpose to escape liability for future corporate debts, was, of itself, sufficient to defeat the transfer, and to continue his ownership in equity.
• If as an aid to the construction of the finding resort be had to the evidence, little, if anything, of value for this purpose is found except the statement of Mr. Peter, himself. That is as follows:
“Q. It appears from the records here, on the7th of November, 1889, you transferred to Sarah E. Peter, one thousand shares of the capital stock of this company, of the value of $100,000 — that is, the par value ; please explain that transaction.”
*206 A. I sold her the stock for the purpose of getting rid of the liabilities.
Mr. Tollerton:
Q. Was there any consideration?
A. Yes; I took her note for it.
Q. Mrs. Peter is your wife?
A. No, sir; she is the wife of a nephew I have, a worthless- fellow. I take care of her. She lives with me in my family.
Mr. Bissell:
Q. Where does she live ?
A. In Columbiaville. She has been here with us, and then from here I went to Columbiaville.
Mr. Smith:
Q. Where do you now reside?
A. Now, I live in Michigan. I don’t come here as often as I did go to Michigan when I lived here.
Mr. Bissell:
Q. Are you still a director in the company;
A. No, sir.
Q. When did you cease being a director ?
A. I don’t know; a year ago — last January, I guess.
Q. You were a director up to January, 1891?
A. I guess so, yes; it wasn’t convenient for me here, as I, wasn’t here, and, why, put somebody else in — •
Mr. Kinney:
Q. State whether or not these thousand shares that are transferred to Sarah E. Peter by you were sold to her absolutely ?
A. I sold it to her out and out, and took her note for it.
Mr. Smith:
I am a little curious to know the amount of the note that Sarah E. Peter gave you for this stock?
*207 A. I took her note, dollar for dollar. I considered the note as good as the stock.”
This testimony of Mr. Peter’s together with the phraseology of the finding of the court upon this subject raises a strong presumption that the circuit court held him to continued liability to future corporate creditors on account of this stock, on the sole ground that his purpose to escape liability under the statute for future corporate debts, together with his transfering it to an insolvent person, defeated the transfer.
In reviewing a judgment based upon a finding of fact, a reviewing court should steadily lean towards that construction of the finding which would support the judgment; but where after applying this principle to its fullest extent, nevertheless, the reviewing court finds itself in great doubt concerning the grounds upon which the judgment was founded, it, in the exercise of a sound discretion, should require the court rendering the judgment to find the facts more specifically.
If the circuit court were .of opinion that the transfer of the one thousand shares of stock to an insolvent member of his family by Mr. Peter, his purpose in the transaction being to escape liability to future corporate creditors was, alone, sufficient to continue in him their equitable ownership, and founded their judgment on that view of the question we think their judgment in this respect was erroneous.
In the absence of a by-law on the subject, and treated simply as property no reason is apparent for limiting the power of disposition over corporate stock within narrower bounds that those pertaining to other species of property. Under *208 the decisions of this court, the owner cannot, by a transfer of his stock, defeat the ultimate right of existing creditors, to relief against him. But upon what grounds do future corporate creditors plant their rights to relief against one who had ceased to be a stockholder before their claims arose. If he had, in fact, disposed of his stock and the stock had been transferred on the books of the corporation, as to such future creditors it was if he had never been a stockholder. If the transaction was not bona fide; if it was a ruse or device by which he sought to hold himself out to the world as divested of his ownership while by some understanding or agreement, express or implied, the transferee held it for him, he doubtless would remain the equitable owner, and under the express words of our statute would remain liable to assessment to pay future corporate debts.
If, however, the transaction is bona fide and the shares transferred on the proper corporate books, future creditors are not concerned with the motives which actuated the former owner. It was the right and privilege of such owner to sell to any purchaser who would buy,' or to donate to any person who would accept the gift, his worthless corporate stock, and if, in such case, the transaction is completed by a transfer of the stock, persons who thereafter give credit to the corporation have no claim against such former owner.
If the sale and transfer is absolute and made in good faith the former owner does not thereafter remain the equitable owner by reason of the facts that the worthless stock passed either by gift or sale, into the ownership of an insolvent transferee, and the sole object of the former *209 holder in entering into the transaction was to escape liability for future debts of the corporation.
In order to correctly apply these principles to the transfer made by Mr. Peter, the findings of fact should be made certain. It should show whether the sale was absolute, or whether by some agreement or understanding, express or implied, by the circumstances, the transferee held the stock, transfered to her, for his present or ultimate benefit.

Judgment reversed in part and affirmed in part.